UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Michigan BAC Health Care Fund,
Trustees of; Michigan BAC Pension
Fund, Trustees of; Michigan BAC
Apprenticeship & Training Fund,
Trustees of; International Union of
Bricklayers and Allied Craftworkers,
Local 2, AFL-CIO; Bricklayers &
Trowel Trades International Pension
Fund, Trustees of; and International
Masonry Institute, Trustees of;

     Plaintiffs,

v.

Hartley Masonry Services, Inc.,
Hartley Masonry, Inc., Andrew J.
Hartley, Kari Lee Hartley, and Kari
L Hartley d/b/a/ Hartley Masonry
Services,

     Defendants.
_____/

Case No. 17-12260

Sean F. Cox
United States District Court Judge

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 49) AND
GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 51)**

This is an ERISA action to collect unpaid fringe benefits. Plaintiffs are jointly administered, multi-employer benefit funds. Defendants are a married couple and their business entities. Plaintiffs argue that an interim agreement signed on behalf of the wife's defunct sole-proprietorship binds her husband's subsequent corporation because the two entities are alter egos. Defendants respond that the agreement cannot bind them because (1) they never saw the incorporated-by-reference collective

1

bargaining agreement, (2) they provided valid notice of termination, (3) and the corporation is not the proprietorship's alter ego.

All parties have moved for summary judgment. For the reasons below, the Court will GRANT Plaintiffs' Motion for Summary Judgment as to Defendants Kari Lee Hartley, Kari Lee Hartley d/b/a Hartley Masonry Services, and Hartley Masonry, Inc, and DENY Plaintiffs' Motion as to Defendants Andrew Hartley and Hartley Masonry Services, Inc. Further, the Court will GRANT Defendants' Motion for Summary Judgment as to Defendants Andrew Hartley and Hartley Masonry Services, Inc, and DENY Defendants' Motion for Summary Judgment as to Defendants Kari Lee Hartley, Kari Lee Hartley d/b/a Hartley Masonry Services, and Hartley Masonry, Inc.

In sum, the Court finds that the undisputed evidence shows that Kari Lee Hartley (i.e. Hartley Masonry Services) and Hartley Masonry, Inc, are liable for unpaid fringe benefits, and that Andrew Hartley and Hartley Masonry Services, Inc, are not.

## BACKGROUND

Kari Lee Hartley and Andrew Hartley are married. (D.E. 50, PageID 1274). Kari owns a ReMax real estate agency and Andrew has worked in the masonry industry since 1995. (D.E. 58-2, PageID 1657; D.E. 49-2, PageID 1110). This case deals with Andrew, Kari, and three entities that the Hartleys organized during a 17-year long attempt to succeed in the masonry business.

In 2001, Andrew established a sole proprietorship with the assumed name of Hartley Masonry Services. In 2006, Andrew incorporated his sole proprietorship into the first entity that is relevant to this case: Hartley Masonry Services, Inc. ("HMSI") (D.E. 49-2, PageID 1111). In 2009, Andrew stopped operating HMSI and went to work for a different masonry company. (D.E. 49-2, PageID 1113).

After a two-year stint with this other company, Andrew and Kari decided to start a new masonry business. On September 16, 2011, Kari filed paperwork with the Genesee County Clerk, establishing the second entity that is relevant to this case—a sole proprietorship with the assumed name of Hartley Masonry Services. ("HMS"). (D. E. 51-2, PageID 1312). At HMS, Kari handled the business administration (e.g. paperwork, payroll, compliance, etc.), (D.E 49-2, PageID 1113; D.E. 51-4, PageID 1320-1322), and Andrew handled the masonry-related work (e.g. estimating, placing bids, hiring masons and laborers, supervising and working at job sites, etc.). (D.E. 49-2, PageID 1114; D.E. 51-4, PageID 1321).

In an effort to get hired onto bigger projects, Kari authorized Andrew to enter into a collective bargaining agreement with the International Union of Bricklayers & Allied Craftworkers (BAC) Local 9. (D.E. 58-2, PageID 1704, Kari Hartley Aff. ¶ 4 ("I authorized by husband, Andrew Hartley, to take the steps necessary to join the Bricklayers and Carpenters Union...")). On July 16, 2013, Andrew and the Union signed an Interim Agreement, which read:

> The parties recognize that this interim agreement is in place as a result of timeliness in that, although 2012 contract negotiations are complete, the settled contract has not reached final print. Therefore, the undersigned Employer agrees to abide by the terms and conditions of the **August 1, 2012 through July 31, 2014** collective bargaining agreement[1] between the International Union of Bricklayers and Allied Craftworkers (BAC) Local 9, Mason Contractors Association.

(D.E. 51-17, Page ID. 1422) (emphasis in original)

Kari acknowledges that Andrew's signature bound HMS to the Interim Contract. (D.E. 58-2, PageID 1704, Kari Hartley Aff. ("I...acknowledge that [Andrew's] signature bound my d/b/a HMS to the Interim Contract signed.")).

---

[1] Throughout this opinion, the August 1, 2012 through July 31, 2014 collective bargaining agreement is referred to as "the CBA."

3

The CBA required HMS to file monthly reports and remit fringe-benefit contributions to the Plaintiffs for all hours of union-covered work performed by its employees. (D.E. 50, PageID 1275).

The CBA also contained an automatic-renewal clause that required written notice of termination:

> This Agreement shall continue in full force and effect from August 1, 2012 through July 31, 2014. No more than ninety (90) days and not less than sixty (60) days before the expiration date of this Agreement, either party may give notice to the other that it desires to terminate or modify this Agreement , and upon receipt of *such written notice* the parties agree to meet and confer for purposes of attempting to negotiate a new Agreement.
>
> If neither party gives such notice to amend or terminate, this Agreement shall remain in full force and effect from year to year thereafter, unless no more than ninety (90) and no less than (60) days prior to any annual anniversary date, *notice be given in writing* by either party to the other, indicating a desire to amend or terminate on said annual anniversary date. If any non-Association Employer fails to give such notice and a new Agreement is reached between the Association and the Union then the new Agreement shall automatically bind such non-Association Employer and be adopted in its entirety by such Employer.

(D.E. 49-2, PageID 1244) (emphasis added)

HMS's union affiliation did not go as hoped. After general contractors repeatedly failed to pay HMS for union jobs, Andrew and Kari became frustrated. (D.E. 51-5, PageID 1346-1348). Kari wanted out of the masonry business, and Andrew wanted to shift his focus back to residential and small commercial jobs. (D.E. 51-5, PageID 1347). In March 2014, Kari contacted Plaintiffs to "advise[] of [her] decision to end [her] Union relationship," and Andrew incorporated a third company, Hartley Masonry Inc. ("HMI"). (D.E. 49-2, PageID 1164).

Two months later, Kari and Andrew met with Plaintiffs' representatives to discuss their frustration and decision to end the Union relationship. (D.E. 49-2, PageID 1164). At this face-to-face meeting, Kari "clearly and unequivocally communicated the termination of [her] contract with

Plaintiff[s]." (D.E. 49-2, PageID 1166; D.E. 49-2, PageID 1172).

After May 2014, HMS accepted "no new work and wound down any and all activity" it had undertaken in the masonry field. (D.E. 49-2, PageID 1165). In July 2014, HMS transferred its workers' compensation insurance to HMI. (D.E. 51-8, PageID 1373-1377). HMS continued operating until at least November 2014. (D.E. 51-4, PageID 1333).

Andrew has owned and operated HMI since its incorporation. Kari has "completely ceased doing any office or bookkeeping work for any masonry business," but "assist[s] [Andrew] from time-to-time, as need, with any questions or confusion he may have with paperwork on his business." (D.E. 49-2, PageID 1166). She considers this occasional help to be "no different than helping [her] child study or helping [her] mother fill out a Social Security application." *Id*.

HMI operates out of the same address, (D.E. 51-2, PageID 1311), and uses the same third-party professionals that HMS did. (D.E. 51-4, PageID 1330, D.E. 51-5, PageID 1350).

HMS did not have a 2014 Earnings Report. Rather, the earnings of HMS's employees were reported on HMI's 2014 Earnings Report. (D.E. 51-9, PageID. 1379).

All of HMI's employees previously worked for HMS. With one exception, none of these employees were told that he was now working for HMI instead of HMS. (D.E. 51-9; D.E. 51-10; D.E. 51-11; D.E. 51-5, PageID 1348). Similarly, HMI uses HMS's supplier, which was also not informed about the distinction between the two entities. (D.E. 51-4, PageID 1339).

In April 2015, January 2016, and February 2016, HMI paid for supplies using HMS's credit card. (D.E. 51-5, PageID 1355-1358).

In June 2015, Plaintiffs audited HMS for the period of July 2013 to December 2014. (D.E. 51-30, PageID 1546-1547). The audit revealed that HMS owed $11,826.43 in delinquent fringe-

5

benefit contributions. *Id*. In September 2016, HMI issued checks to pay what HMS owed. (D.E. 51-12, PageID 1391). Kari signed these checks. *Id*.

In May of 2016, Plaintiffs became suspicious of the relationship between HMS and HMI, and requested an audit of HMI. (D.E. 53, PageID 1583). HMI denied this request. Plaintiffs then sent an Information Request to HMI. (D.E. 50, PageID 1287). On April 6, 2017, Kari completed this request on behalf of HMI, but answered "N/A" to questions related to HMS. (D.E. 50, PageID 1288).

On July 11, 2017, Plaintiffs filed this action, naming HMSI, HMI, and Andrew as defendants and alleging (1) failure to submit records and to make benefit contributions as violation of ERISA; (2) failure to submit to audit and make benefit contributions and reports as violations the CBAs and trust agreements; (3) alter ego/successor liability; (4) violation of the Michigan Building Contract Fund Act; and (5) breach of fiduciary duties under ERISA. (D.E. 1). On April 27, 2017, Magistrate Judge R. Steven Whalen granted Plaintiffs' motion to amend the complaint to add Kari, individually, and Kari Lee Hartley d/b/a HMS.

All plaintiffs and all defendants have moved for summary judgment on all claims. Plaintiffs argue that HMI is an alter ego of HMS and, therefore, both entities are contractually obligated to pay fringe-benefit contributions under the CBA. Defendants disagree, and also argue that they are not bound to the CBA and, even if they were at one point, Kari provided sufficient notice of termination.

**ANALYSIS**

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving

6

party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

I. **Plaintiffs' Motion for Summary Judgment**

A. **Plainttif's Alter-Ego Argument**

Plaintiffs argue that HMI and HMS are liable for each other's fringe-benefit contributions because they are alter egos. The alter-ego doctrine is an equitable doctrine that prevents employers from evading their obligations under a CBA "by changing or altering their corporate form." *Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 317–18 (6th Cir.2009) ("*Detroit Carpenters*") (quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir.1986)) (internal quotation marks omitted). "The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer." *Id.* at 318. It applies in two contexts: (1) where a "new entity begins operations but is merely a disguised continuance of the old employer," and (2) in "double-breasted operations," i.e., "where two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* (quoting *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (internal quotation marks omitted).

The test for determining whether two companies are alter egos is "whether the two enterprises have substantially identical management, business purpose, operation, equipment,

7

customers, supervision and ownership." *Id*. (quoting *Fullerton Transfer*, 910 F.2d at 336) (internal quotation marks omitted) ("the *Fullerton* test"). "[N]o individual factor is outcome determinative; instead 'all the relevant factors must be considered together.'" *Detroit Carpenters*, 581 F.3d at 318 (quoting *Allcoast Transfer*, 780 F.2d at 582). The *Fullerton* test has been described as a "more relaxed, less exacting" application of the alter-ego doctrine applied "[i]n order to effectuate federal labor policies." *Road Sprinklers Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012).

     **B.**     **Lack of an Intent Requirement**

Before applying the *Fullerton* test, the Court will address one of Defendants' arguments against a finding of alter-ego status. Defendants argue that the Sixth Circuit "appears" to require Plaintiff to show some effort at fraud or "something like it." (D.E. 58, PageID 1630-1633). Defendants describe the intent to evade CBA obligations as the "critical element" and a "very influential" factor "given the continued question of whether it should be viewed as a necessary element." (D.E. 58, PageID 1633).

To support this argument, Defendants cite a passage from *Southeast Texas Inns., Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674 (6th Cir. 2006). (D.E. 58, PageID 1630). However, in that case, the Sixth Circuit applied Delaware and Tennessee law, not *Fullerton*. Defendants' cited passage, itself, makes this clear. (D.E. 58, PageID 1630) (citing *Southeast Texas*, 462 F.3d at 674) ("Moreover, insofar as the parties debate whether Southeast must show 'actual fraud' or 'fraud per se,' this is largely a matter of semantics under the circumstances, and underscores that the choice-of-law issue is not pivotal, given that *under Delaware and Tennessee law*, 'fraud or similar injustice' must be demonstrated in order to pierce the corporate veil.") (emphasis added).

8

Contrary to Defendants' argument, the Sixth Circuit has clearly stated that an employer's intent to evade CBA obligations is "a relevant factor to be considered in determining whether the alter ego doctrine is applicable, along with the [*Fullerton* test]—but it is *not* essential to the imposition of alter ego status." *Detroit Carpenters*, 581 F.3d at 319 (citing *Allcoast*, 780 F.2d at 579 and *Fullerton Transfer*, 910 F.2d at 337) (emphasis in original). In fact, an employer may be liable as an alter ego "even when a reorganization is supported by legitimate reasons." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587 n.14 (6th Cir. 2006), *abrogation on other grounds recognized by Cole v. Meritor, Inc.*, 855 F.3d 695, 699 (6th Cir. 2017).

### C. Applying the *Fullerton* Test

Plaintiffs argue that, under *Fullerton,* HMS and HMI are "substantially identical enterprises" and are "one and same by every salient measure." (D.E. 51, PageID 1301). Defendants argue that the similarities are "disingenuous and distinguishable at best." (D.E. 58, PageID 1637). The Court will apply each *Fullerton* factor in turn.

#### 1. Management

At HMS, Kari handled the office work, such as bookkeeping, payroll, and compliance. (D.E 49-2, PageID 1113; D.E. 51-4, PageID 1320-1322, D.E. 58-2, PageID 1707). Although Defendants characterize Andrew as Kari's employee, he was admittedly responsible for all of the masonry-related work including estimating, placing bids, hiring masons and laborers, and supervising and working at job sites. (D.E. 49-2, PageID 1114; D.E. 51-4, PageID 1321, D.E. 58-2, PageID 1707). Thus, the facts show that Kari and Andrew were both responsible for the day-to-day management of HMS.

To be sure, Kari appears to have a smaller role at HMI. But the evidence also shows that

HMI is effectively managed by Kari and Andrew. Andrew is the owner and operator of HMI. Kari asserts that she has "ceased doing any office or bookkeeping work for any masonry business," but admits that she sometimes assists her husband with paperwork. (D.E. 58-2, PageID 1707). Kari also signs checks issued from HMI's account, (D.E. 51-12, PageID 1391), and responds to requests for information on HMI's behalf. (D.E. 51-4, PageID 1336). From these undisputed facts, the Court concludes that Kari has some involvement, authority, and representative capacity at HMI. Thus, the management factor weighs in favor of Plaintiffs.

### 2. Business Purpose

HMS performed commercial masonry work. (D.E. 51-22, PageID 1475-1491). HMI performs residential and "small commercial" masonry work. (D.E. 58, PageID 1637). Although the exact type of work, and the magnitude of projects, might be different, HMS and HMI are in the same industry and have the same business purpose: to perform masonry work. Thus, the business-purpose factor weighs in favor of Plaintiffs.

### 3. Operations

The operations of HMS and HMI overlap significantly. The entities shared the same address. (D.E. 51-2, PageID 1311). The entities used the same third-party professionals, including Anna Silman's Tax Services, Inc, and Patricia Schofield Accounting & Tax Services. (D.E. 51-4, PageID 1330, D.E. 51-5, PageID 1350). All of HMI's employees previously worked for HMS and, with one exception, were not told when their employer changed to HMI. (D.E. 51-9; D.E. 51-10; D.E. 51-11; D.E. 51-5, PageID 1348). HMI and HMS used the same supplier, which was also not informed about the start of HMI and the end of HMS. (D.E. 51-4, PageID 1339). HMS transferred its workers' compensation insurance to HMI. (D.E. 51-8, PageID 1373- 1377). HMI used HMS's

assets to purchase supplies for its projects. (D.E. 51-5, PageID 1355-1358). HMI paid HMS's debts. (D.E. 51-12, PageID 1391). HMI reported the earnings of HMS's employees on its 2014 Earnings Report. (D.E. 51-9, PageID 1380-1381). On its 2014 taxes, HMI showed a tax deduction for the payment of $74,551 to the "Michigan & International Benefit Funds"—payments that were made by HMS. (D.E. 51-5, PageID 1365-1366). All of these undisputed facts cause the operations factor to weigh heavily in favor of Plaintiffs.

### 4. Equipment

In Andrew's affidavit, he states that "masonry workers have their own hand tools" and that "all materials are purchased on a job-to-job basis and equipment, such as a mixer, is usually supplied on site or rented." (D.E. 58-2, PageID 1714-1715). Thus, the equipment factor favors neither Plaintiffs nor Defendants because HMS and HMI do not own any equipment.

### 5. Customers

HMI and HMS have at least some overlap in customers, including DW Lurvey Construction Co, and Siwek Construction. (D.E. 51, PageID 1302; D.E. 58, PageID 1637). Thus, the customers factor weighs in favor of Plaintiff.

### 6. Supervision

In the labor context, Congress has defined a "supervisor" as one who "in the interest of the employer" has the authority to "responsibly [] direct" employees, provided the direction "is not of a merely or clerical nature" but requires the use of independent judgment." 29 U.S.C. § 152; *See also Trustees of the of the Operating Engineers' Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 2018 WL 731944 at *6 (E.D. Mich. Feb. 6, 2018) ("*Operating Engineers*") (applying this definition in a context similar to this case). Under this definition, Andrew was a supervisor at HMS

11

because he oversaw all on-site operations. Andrew also holds a supervisory role at HMI. Thus, the supervision factor weighs in favor of Plaintiffs.

### 7. Ownership

There is no question that, on paper, HMS and HMI have different owners. HMS was a sole proprietorship (i.e. a "d/b/a"), wholly owned by Kari. HMI is a corporation, wholly owned by Andrew. However, the analysis does not end there.

"Ownership by members of the same family may be considered in establishing a common ownership." *Bricklayers Pension Trust Fund-Metropolitan Area, et. al. v. E&R Masonry Construction Inc. et. al.* 2015 WL 12990250 at *3 (E.D. Mich. 2015); *See also Operating Engineers*, 2018 WL 731944 at *7; *Trustees of Painters Union Deposit Fund v. Interior/Exterior Specialist, Co.*, 2008 WL 724355 at *15 (E.D. Mich. 2008); *Pipefitters Union Local No. 392 v. Aggressive Piping Corp.*, 841 F.Supp 224, 227 (S.D. Ohio, 1991)

Here, HMI and HMS are wholly owned by members of the same family. Thus, the ownership factor weighs in favor of Plaintiffs.

### 8. Intent to Evade

In their affidavits, Andrew and Kari state that they switched from HMS to HMI because Kari wanted out of the masonry business. (D.E. 58-2, PageID 1706, 1713). Thus, the intent-to-evade factor favors Defendants.

### C. Alter-ego Conclusion

In sum, the undisputed evidence shows that HMS and HMI have substantially identical management, business purposes, operations, customers, supervision, and ownership. The equipment

12

factor favors neither side, and the intent-to-evade factor favors Defendants. Considering all these factors together, the Court concludes that there is no genuine issue of material fact as to whether HMI and HMS are alter egos. They are.

**II. Defendants' Response and Motion for Summary Judgment**

    **A.    Contractual Defenses**

Besides opposing Plaintiff's alter-ego argument, Defendants raise two contractual defenses. First, Defendants argue that they never received a copy of the CBA referenced in the Interim Agreement and, thus, cannot be bound by it. Second, Defendants argue that, even if they were once bound by the CBA, they properly terminated their obligations by orally informing Plaintiffs of their desire to dissociate from the Union. Both of these arguments fail as a matter of law.

First, the Interim Agreement is enforceable even if Defendants signed it without receiving or reading the CBA. *See Michigan Electrical Employees Pension Fund v. Encompass Electric & Data, Inc.*, 556 F.Supp.2d 746, 759-762 (W.D. Mich. 2008) ("*Electrical Employees*"). In *Electrical Employees,* a court was confronted by the same argument and responded that "parties generally have a duty to read a contract and know what they are signing," and that "ordinary diligence and common sense should lead a person to obtain a copy of all documents that will define the parties' rights and duties before he decides whether to enter into a contract." *Id*. at 759. The court found these principles to be particularly true where the person is signing a contract that may well affect the very survival of the company that he founded, capitalized, and depends on for his livelihood. *Id*.[2] The *Electric Employees* court concluded that "[i]f [the company's president] signed the letters of assent

---

    [2]These principles are also particularly true when, as here, a principal authorizes her agent to sign a contract for which the principal will be personally liable.

without seeing the CBAs, that was a voluntary choice, and he alone is to blame if the CBAs imposed too onerous a burden on [the company]." *Id.*

*Electric Employees* is persuasive here. Andrew was Kari's authorized agent, who entered the Interim Agreement and thereby bound Kari to its terms. The Interim Agreement expressly incorporated the terms of the CBA. If Kari authorized Andrew to enter into the agreement without reading the CBA, she still bears the burden of the CBA.

Second, the record clearly shows that Defendants did not properly terminate their fringe-benefit obligations according to the CBA. "Unless ambiguous, a collective bargaining agreement is limited to the language contained in its four corners." *Trustees of B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.*, 163 F.3d 965, 969 (6th Cir. 1998). Here, the CBA's termination clause contained clear, unambiguous terms upon which the CBA may be cancelled: through written notice by either party of their intent to terminate, within a certain time period before the expiration date. (D.E. 49-2, PageID 1244). If neither party provided this written notice, the CBA would "remain in full force and effect from year to year thereafter." *Id.* This so-called "evergreen clause" is legally valid and, when neither party properly terminates, "all of the attendant contractual obligations naturally continue for the period of renewal." *Fantin*, 163 F.3d at 968.

There is no evidence that Defendants ever provided written notice of termination. Instead Defendants argue that a combination of a phone call and a face-to-face meeting provides sufficient notice of termination under the CBA. (D.E. 49, PageID 1089, 1098). This argument is unavailing because it contradicts the CBA's clear terms.

In passing, Defendants also argue that the doctrine of laches should bar Plaintiffs' effort to enforce the CBA. (D.E. 58, PageID 1634) ("Because Plaintiff responded with silence in the face of

Defendants' notice of termination tendered at a face-to-face meeting after a phone call summarizing same, Plaintiff's ability to claim equitable remedies should be sufficiently limited."). However, laches cannot be a defense when an employee-benefits trust fund sues to collect delinquent contributions. *Outstate Michigan Trowel Trades Health and Welfare Fund v. Lacaria Const., Inc.*, 2012 WL 5817915 at *10-11 (E.D. Mich. 2012); *See also Bakery Confectionery Union and Industry Intern. Health Benefits and Pension Funds v. New Bakery Co. Of Ohio.*, 133 F.3d 955, 959 (6th Cir. 1998) ("The fund thus stands much like a holder in due course in commercial law who is entitled to enforce the writing without regard to understandings or defenses applicable to the original parties.") (internal citations omitted).

For these reasons, the Defendant's contractual defenses are meritless.

### B. Improper-Defendant Arguments

Defendants argue that, for various reasons, none of them are bound by the CBA. These arguments are persuasive for Andrew and HMSI.

#### 1. HMSI

Defendants assert that HMSI has not been in existence since 2009—over four years before the CBA was signed. Plaintiffs do not seem to dispute this fact and a non-existent defendant cannot be liable on a contract.

Moreover, even if HMSI does still exist, it did not sign the CBA and Plaintiffs do not advance any legal theory (such as alter-ego) or evidence that would allow the Court to conclude that HMSI is bound by the CBA. For these reasons, summary judgment will be granted in favor of HMSI.

#### 2. HMI

15

At various points, Defendants argue that HMI cannot be liable on the CBA because HMI is not a party to it. As explained above, HMI is HMS's alter ego and, therefore, bound by the CBA's terms.

### 3. Andrew

Defendants argue that Andrew cannot be personally liable on the CBA. The Court agrees. "[A]n agent is not liable for the contracts it makes on behalf a disclosed principal." *Mickam v. Joseph Louis Palace Trust*, 849 F.Supp. 516, 520 (E.D. Mich. 1993). Andrew signed the CBA as the agent of Kari/HMS. Moreover, Andrew owns HMI as a corporation. Owners of corporate stock are generally not liable for corporate debt and Plaintiffs have not attempt to pierce the corporate veil. Thus, the Court concludes that summary judgment should be granted in favor of Andrew.[3]

### 4. Kari and HMS

As Defendants themselves say, "[t]hese Defendants are one and same. It is simply Kari Hartley." (D.E. 49, PageID 1093). Defendants argue that Kari cannot be liable for fringe-benefit contributions because she has not engaged in the masonry business since she terminated the CBA.

HMS was a sole proprietorship, which is "[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity." Black's Law Dictionary (10th ed. 2014). Kari is responsible for HMS's debts, including those incurred by the CBA agreement. As explained above, HMS did not properly terminate its obligations and HMS is HMI's alter ego. As such, HMS (i.e. Kari) is liable for any fringe-benefit contributions that either it or HMI has not paid.

---

[3]In Plaintiffs' Amended Complaint, they assert that Andrew breached his fiduciary duties under ERISA. Plaintiffs have not developed this argument *at all* and the Court sees no reason to hold Andrew personally liable on this theory.

### III. Award

The Court will enter judgment in favor of Plaintiffs and against Kari Lee Hartley (d/b/a HMS) and HMI. But, the Court must first determine the appropriate award. As requested by Plaintiffs, the Court will order HMI to produce all its books and records that Plaintiffs need to conduct an audit for all periods unaudited. Once this audit is complete, the parties shall submit supplemental briefs on the issue of total damages (e.g. unpaid contributions, interest, costs, attorney's fees, etc.), in accordance with the schedule outlined in the order below.

## CONCLUSION

In sum, Kari Lee Hartley (as the sole proprietor of HMS) and HMI are liable for any fringe-benefit payments that are due under the CBA. Andrew Hartley and HMSI are not.

## ORDER

For these reasons, the Court hereby ORDERS that Plaintiff's Motion for Summary Judgment as to Defendants Kari Lee Hartley, Kari Lee Hartley d/b/a Hartley Masonry Services, and Hartley Masonry Inc. is GRANTED and Plaintiff's Motion for Summary Judgment as to Defendants Andrew Hartley and Hartley Masonry Services, Inc. is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to Defendants Andrew Hartley and Hartley Masonry Services, Inc. is GRANTED and Defendant's Motion for Summary Judgment as to Defendants Kari Lee Hartley, Kari Lee Hartley d/b/a Hartley Masonry Services, and Hartley Masonry Inc. is DENIED.

IT IS FURTHER ORDERED that Hartley Masonry Inc. and Kari Lee Hartley (d/b/a Hartley Masonry Services) shall produce all books and records necessary for Plaintiffs to conduct an audit for all periods unaudited. These books and records shall be produced to Plaintiffs within 28 days

of the date this order is issued. Plaintiffs shall file a notice with the Court when they receive the records.

IT IS FURTHER ORDERED that Plaintiffs shall complete the audit within 14 days of receiving the books and records. Immediately after Plaintiffs complete the audit, Plaintiffs shall notify Defendants and file a notice with the Court, detailing the results of the audit. Within 10 days of the filing of this notice, each party shall file supplemental briefing, not to exceed seven pages, on the appropriate amount of total damages to be assessed against Hartley Masonry Inc. and Kari Lee Hartley (d/b/a Hartley Masonry Services).

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: December 12, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 12, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager